**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0409-16T3

JOAN FRANCES LUCIANO
IRREVOCABLE TRUST, and
MICHAEL J. LUCIANO,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

WASTE MANAGEMENT, INC.,
and WASTE MANAGEMENT OF
NEW JERSEY, INC.,

     Defendants/Third-Party
     Plaintiffs-Respondents/
     Cross-Appellants,

v.

HUGH B. MCCLUSKEY,

     Third-Party Defendant-
     Respondent.

_____

        Argued May 10, 2018 — Decided August 15, 2018

        Before Judges Simonelli, Rothstadt and Gooden
        Brown.

        On appeal from Superior Court of New Jersey,
        Law Division, Morris County, Docket No. L-
        1695-15.

Jorge R. de Armas argued the cause for appellants/cross-respondents (Waters, McPherson, McNeill, PC, attorneys; Jorge R. de Armas and Daniel E. Horgan, on the briefs).

Peter R. Yarem argued the cause for respondents/cross-appellants (Scarinci & Hollenbeck, LLC, attorneys; Peter R. Yarem, of counsel and on the briefs; Laura M. Miller, on the briefs).

Hugh B. McCluskey, respondent, argued the cause pro se.

PER CURIAM

Plaintiffs, the Joan Frances Luciano Irrevocable Trust and Michael J. Luciano (collectively, the Lucianos), and defendants Waste Management, Inc. and Waste Management of New Jersey, Inc. (collectively, Waste Management), appeal from the Law Division's April 22, 2016 order dismissing their claims against each other. The Lucianos also appeal from a July 25, 2016 order denying their motion for leave to file an amended complaint.

In their complaint, the Lucianos alleged that Waste Management wrongfully terminated payment of royalties that they and third-party defendant, Hugh B. McCluskey, were owed under an agreement relating to solid waste transfer stations they developed and later sold to Waste Management's predecessors. Waste Management denied it was obligated to pay any royalties after it sold the transfer stations and further, that they were entitled

to recover from the Lucianos and McCluskey any amounts they paid in error after their sale.

Judge Stuart A. Minkowitz dismissed the Lucianos' complaint after he concluded that their entitlement to royalties was conditioned upon Waste Management continuing to operate and earn income from the transfer stations, which it continued to do until 2013. He dismissed Waste Management's counterclaim because it operated the transfer stations through 2013, and in any event did not timely assert its rights. The judge denied the Lucianos' motion to amend because the proposed amendment would still not give rise to a cause of action against Waste Management.

On appeal, the Lucianos primarily argue that they were entitled to the continued payment of royalties regardless of Waste Management's lack of involvement as the owner or operator of the transfer stations. Waste Management contends that after it sold the transfer stations, its obligation to pay royalties ceased. We disagree with both parties.

For the reasons that follow, we affirm Judge Minkowitz's decisions substantially for the reasons expressed in his April 22, 2016 and July 25, 2016 written statements of reasons addressing the parties' claims.

The facts derived from the motion record leading to the dismissal of the parties' claims are generally not in dispute.

They are summarized as follows. The parties' disagreement focused upon a provision in a 1990 contract between the Lucianos, McCluskey and Waste Management's predecessors that required they cooperate to ensure the continued existence of solid waste transfer stations in Morris County. The agreement also provided that the Lucianos and McCluskey would be paid a royalty based upon the amount of waste handled by the transfer stations. The royalties were paid to the Lucianos and McCluskey until 2013, when Waste Management lost the public bid contract to operate the transfer stations.

The 1990 agreement arose from the Lucianos' and McCluskey's activities almost thirty years ago. At that time, they incorporated Morris County Transfer Stations, Inc. (MCTS) to develop two solid waste transfer stations in Morris County. The transfer stations were an interim solution to Morris County's solid waste issues, which were to be ultimately resolved by the construction of a resource recovery facility — i.e. an incinerator — by December 1990.

The Lucianos and McCluskey were the sole shareholders of MCTS until October 28, 1987, when they sold all of their shares to Chambers of New Jersey, Inc. (Chambers). Under the October 28, 1987 stock purchase agreement, MCTS paid the Lucianos and McCluskey "royalties of [one dollar] per ton for each ton of municipal solid waste accepted and processed by [MCTS]" at the transfer stations.

A separate agreement dated November 10, 1987 that addressed the royalty payments, similarly based the royalty upon "solid waste accepted and processed by [MCTS] at the Solid Waste Transfer Station . . . which are constructed, developed and operated by [MCTS] . . . ." (Emphasis added). In accordance with the terms of the 1987 agreements, those payments stopped in 1990, but resumed after November 20, 1990, when the Lucianos and McCluskey entered into the agreement with MCTS that is the subject of this dispute.

Dating back to November 23, 1987, MCTS was involved in litigation with the Morris County Municipal Utility Authority (MCMUA) and Morris County before the Board of Public Utilities (BPU) and the New Jersey Office of Administrative Law over "the method of rate regulation" for solid waste disposal at the transfer stations. The dispute ended in an October 1989 settlement agreement[1] in which the parties agreed to specific rates to be charged per ton of solid waste handled at the transfer stations for the years 1990 through 1994. The agreement also provided that "[u]pon the [c]ommercial [o]peration date of the County's resource recovery facility on or after January 1, 1993, the operation of MCTS' transfer stations shall terminate . . . ." If the facility was not operational by January 1, 1993, the agreed upon rate for

---

[1]  The terms of the agreement were reflected in the Morris County Solid Waste Management Plan Amendment dated October 1989.

1994 would take effect, and if the facility was still not operating by December 31, 1994, the agreement stated that "MCTS' rates for 1995 shall be established by petition to the BPU . . . ."

The settlement prompted the Lucianos, McCluskey and MCTS to enter into the November 20, 1990 agreement in which they agreed to not compete and to "cooperate in developing one or more plans, proposals and/or agreements . . . in order to extend the useful life of one or both transfer stations" beyond the end of 1992. The agreement called for the continued payment of royalties to the Lucianos and McCluskey, who agreed to waive any claims they had against MCTS regarding any other payments that may have been owed to them under the original October 28, 1987 agreement.

The 1990 agreement's requirement for the payment of royalties was subject to two conditions. Specifically, section three of the agreement stated:

> In the event that (i) the projected operating life of one or both transfer stations, as part of an integrated program for handling and disposing of Morris County's Waste, is extended beyond [five] years, and (ii) a rate per ton for waste handled at the transfer station is established and agreed to by MCTS by agreement, stipulation or settlement, the parties agree that:
>
> . . . .
>
> (c) for each year after the fourth year that the transfer station or stations remain in existence handling Morris County's waste,

A-0409-16T3

> [Lucianos and McCluskey] will be paid an aggregate continuation royalty for solid waste processed at such transfer station(s) of [one dollar] per ton . . . .

> [(Emphasis added).]

Another portion of the agreement acknowledged that extending the transfer stations' useful lives beyond the original five years could result in a reduction in "the amount which must be charged by MCTS per ton for solid waste to recover its costs and earn a reasonable profit . . . resulting in substantial savings to the residents of Morris County." (Emphasis added).

The parties ultimately succeeded in extending the useful lives of the transfer stations. On February 27, 1991, MCTS, MCMUA and Morris County amended their October 1989 settlement agreement to reflect their new arrangement[2] that in exchange for the extension of the lives of the transfer stations beyond December 31, 1992, MCTS would reduce the 1993 and 1994 rates that were previously set in the 1989 settlement agreement in the event that the County's resource recovery facility was not operational on or after January 1, 1993. The amendment also provided:

> In the event that the County provides for the continued operation of MCTS' transfer stations after January 1, 1995 . . ., MCTS' rates, on or after January 1, 1995 and for so

---

[2] The terms of their new arrangement were detailed in the Morris County Solid Waste Management Plan Amendment dated March 1991.

A-0409-16T3

> long as such transfer stations continue to be owned by MCTS . . . shall be established by the BPU.

On December 31, 1993, MCTS sold the transfer stations to the MCMUA, but continued to operate them under a public contract.[3]  In advance of the sale, an attorney for the Lucianos and McCluskey wrote on October 21, 1993 to MCTS's attorney asserting their continued right to the royalty payments despite the sale.  After the sale, payments due to the Lucianos and McCluskey did in fact continue.

After a series of mergers and acquisitions, Waste Management acquired MCTS.  Waste Management continued to operate the transfer stations and make royalty payments to the Lucianos and McCluskey until January 27, 2013, at which point it lost the bid to continue to operate the transfer stations.

On July 8, 2015, the Lucianos filed their complaint alleging that Waste Management breached the 1990 agreement by stopping the royalty payments.  According to the complaint, Waste Management's "obligation to pay the . . . [r]oyalty [arose] . . . from the operation of the [t]ransfer [s]tations" being continued regardless of who was "the operator of the . . . [s]tations . . . ."

---

[3]  These terms were detailed in the Morris County Solid Waste Management Plan Amendment dated November 1993.

In response, Waste Management filed a counterclaim and third-party complaint seeking a return of the royalty payments it made to the Lucianos and McCluskey since 1993. In its pleadings, Waste Management argued that the doctrine of unjust enrichment required the return of the royalty payments it had mistakenly made because the condition precedent to its royalty payments - that the "rate per ton for waste handled at the transfer station [be] established and agreed to by MCTS by agreement, stipulation or settlement" — could not be satisfied after MCTS sold the transfer stations to MCMUA. Waste Management also sought a declaratory judgment to "determine the rights, obligations, and liabilities that exist[ed] among the parties" under the 1990 contract.

In lieu of filing an answer to the counterclaim, the Lucianos filed a motion to dismiss Waste Management's counterclaim under Rule 4:6-2(e), and Waste Management filed a cross-motion for the same relief, seeking to dismiss the Lucianos' complaint. In support of their motion, the Lucianos argued that (1) Waste Management could not rely on its voluntary decision to sell the transfer stations to excuse its obligation to pay the royalties and that the obligation to pay royalties continued as long as Morris County waste is handled by the transfer stations; and (2) Waste Management's claim was barred by the voluntary payment

doctrine[4] and by the applicable statute of limitations. In support of its cross-motion, Waste Management argued that its obligation to pay the royalties ceased after it sold the transfer stations to MCMUA.

On April 22, 2016, Judge Minkowitz granted both motions finding that the parties' 1990 agreement required royalty payments to be made as long as Waste Management operated the transfer stations and participated through an agreement with the MCMUA to set rates, which Waste Management could no longer do as of 2013 because it lost the public contract. With respect to Waste Management's counterclaim, the judge found that unjust enrichment was not a valid claim because a contract existed between the parties and, in any event, if it did, it was barred by the statute of limitations. He also found that the voluntary payment rule barred Waste Management's claim to recover amounts it paid since it sold the transfer stations.

In his written statement of reasons, Judge Minkowitz explained that the parties' agreement

_____

[4] See Cont'l Trailways, Inc. v. Dir., Div. of Motor Vehicles, 102 N.J. 526, 548 (1986) (stating "where a party, without mistake of fact, fraud, duress, or extortion, voluntarily pays money on a demand that is not enforceable against him, he may not recover it" (citations omitted)); see generally Miller v. Eisele, 111 N.J.L. 268 (Ct. Err. & App. 1933) (discussing the voluntary payment rule).

clearly establishes two separate conditions that must exist before performance under the contract is due. . . . [T]he phrase, "[i]n the event that," applies to both . . . conditions . . . . Accordingly, in the event that, (i), the operating life of the transfer station(s) is extended beyond five years, and, (ii), the rate per ton of waste handled at the transfer stations is established and agreed to by MCTS by agreement, stipulation or settlement, a royalty of [one dollar] per ton will be paid to the Lucianos. There is no dispute that condition (i) has continuously been satisfied, as the [t]ransfer [s]tations are still used to this day to handle Morris County waste. As to condition (ii), MCTS or its successor, [Waste Management], established and agreed to the rate per ton for waste until January 2013, when they controlled the [t]ransfer [s]tations, thereby meeting the condition and resulting in royalty payments to the [Lucianos]. . . . However, once [Waste Management] lost its contract with the County of Morris in January 2013, they no longer established and agreed to the rate per ton of waste handled at the [t]ransfer [s]tations. Therefore, this condition was no longer met.

[(Emphasis added).]

In response to the Lucianos' argument that the precondition should not be excused because it was Waste Management's voluntary decision to sell the stations that made it impossible for the precondition to be satisfied, the judge found that the "non-occurrence of a condition is not a breach unless a party is under a duty to maintain the condition[ and h]ere, the contract contains no duty to maintain these conditions." He stated:

11

> This is not a case where parties are subject to liability where a condition precedent may be excused where its performance is prevented or hindered by a breach of the obligor's duty of good faith and fair dealing. . . . Indeed, [the Lucianos have] not alleged that [Waste Management] has purposely prevented or hindered performance, by, for example, purposely submitting a nonconforming bid in order to lose the public contract. Instead, the condition was no longer met because [Waste Management] could no longer establish and agree to rates with their customers. A non-occurrence of a condition is not a breach unless a party is under a duty to maintain the condition. . . . Here, the contract contains no duty to maintain these conditions.

With respect to Waste Management's counterclaim, the judge found that unjust enrichment is "a quasi-contractual claim subject to the six-year statute of limitations." He determined that if unjust enrichment applied that "[b]ecause the [a]greement was entered into in 1990, regardless of continuing royalty payments, the counterclaims are barred by the six-year statute of limitations . . . ." However, the judge noted that Waste Management's claim was barred by the fact that there was a contract between the parties and "unjust enrichment [applied] only when there was no express contract. . . ." Moreover, he observed that "the voluntary payment rule applie[d] as the [c]ourt [found] there [was] an absence of fraud, duress, extortion or mistake of fact."

On June 3, 2016, the Lucianos moved to file a second amended complaint with new exhibits, which included, among other

documents, the 1991 amendment to the settlement agreement between MCTS, MCMUA and Morris County, which they alleged proved that the precondition was not intended to be an ongoing one because once the amended settlement agreement came to fruition "the rate per ton for waste handled at the [t]ransfer [s]tations for 1988 through 1994" was established and "the projected operating life of both [t]ransfer [s]tations [was extended] beyond five years, as sought by the parties . . . ." As a result, they claimed "the [p]recondition was finally, fully and forever satisfied."

On July 25, 2016, Judge Minkowitz denied the motion without oral argument, explaining in a written statement of reasons that the Lucianos "have not provided sufficient proofs to overcome [his] already detailed analysis of the agreement in [his] April 22, 2016 [s]tatement of [r]easons." According to the judge, "the 1991 amendment state[d] that the rates [were] set for '1992, 1993, and 1994,' and [did] not provide for rates thereafter." Therefore, he concluded that "nothing in any agreement or amendment indicate[d] that the rate[s] [were] set <u>ad infinitum</u>."

Waste Management's and McCluskey's respective claims against each other were subsequently dismissed without prejudice through a consent order entered on September 9, 2016. The Lucianos' and Waste Management's cross-appeals followed.

We review de novo a motion judge's order dismissing a complaint under Rule 4:6-2(e), applying the same standard as the motion judge. See Stop & Shop Supermarket Co. v. Cty. of Bergen, 450 N.J. Super. 286, 290 (App. Div. 2017). That standard requires us to examine the challenged pleadings to determine "whether a cause of action is 'suggested' by the facts." Teamsters Local 97 v. State, 434 N.J. Super. 393, 412 (App. Div. 2014) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). We search the pleading "in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250 (App. Div. 2002) (citing Printing Mart-Morristown, 116 N.J. at 746). "[I]t is the existence of the fundament of a cause of action . . . that is pivotal[.]" Teamsters Local 97, 434 N.J. Super. at 412-13 (second alteration in original) (quoting Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005)).

"A pleading should be dismissed if it states no basis for relief and discovery would not provide one." Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 113 (App. Div. 2011) (citing Camden Cty. Energy Recovery Assocs., LP v. N.J. Dep't of Envtl. Prot., 320 N.J. Super. 59, 64 (App. Div. 1999), aff'd, 170 N.J. 246 (2001)). Ordinarily, dismissal for failure to state a claim is without prejudice, and the court has discretion

14

to permit a party to amend the pleading to allege additional facts in an effort to state a claim. See <u>Hoffman v. Hampshire Labs, Inc.</u>, 405 N.J. Super. 105, 116 (App. Div. 2009).

On appeal, the Lucianos argue that Judge Minkowitz erred in granting Waste Management's motion because he misinterpreted the 1990 agreement, ignored circumstances surrounding its entry, and impermissibly rewrote the agreement. Moreover, they contend that their pleadings stated "sufficient facts to withstand the motion for dismissal . . . as to . . . the claimed condition precedent" that "was not an ongoing precondition." In addition, they assert that even if the judge was correct as to the meaning of the disputed provision, he improperly and prematurely foreclosed the Lucianos from presenting any defenses that would still entitle them to the continued royalty payments, such as the fact that Waste Management's voluntary actions prevented the satisfaction of the condition to the payment of the royalties.

The gist of the Lucianos' argument is that under section three of the 1990 agreement, their right to royalties continued so long as the transfer stations "remain[ed] in existence handling Morris County's waste" regardless of who owned or operated them. They argue that Judge Minkowitz "improperly construed the [c]ontract against [them]. . . . because . . . the [p]recondition can be said to be susceptible to more than one interpretation [and

A-0409-16T3

a]s such, the [judge] was required to presume that the Lucianos['] interpretation (that the [p]recondition was satisfied by the settlement of MCTS' dispute with the MCMUA . . .) was the correct one . . . ." They explain that the word "event" used in section three of the agreement actually refers to "the resolution of the uncertainty related to [the] dispute [between MCTS, MCMUA, and Morris County before the BPU over] the extension of the useful life of the [t]ransfer [s]tations beyond 1992 and the rates that MCTS would charge upon such extension."

Waste Management contends that Judge Minkowitz properly dismissed the Lucianos' claims. However, in its cross-appeal, it argues that he should not have dismissed its counterclaim because its "obligation to pay royalties expired in 1994" and its claim to recover the amounts it was not required to pay was not barred by the statute of limitations.

The determination of the parties' appeals thus turns on the meaning of the disputed contract provision. The interpretation of a contract is a question of law that we review de novo. In re Cty. of Atl., 230 N.J. 237, 255 (2017).

"[I]n interpreting an agreement, we 'must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain.'" Barr v. Barr, 418

N.J. Super. 18, 32 (App. Div. 2011) (quoting <u>Celanese Ltd. v.</u> <u>Essex Cty. Imp. Auth.</u>, 404 N.J. Super. 514, 528 (App. Div. 2009)). However, "when the terms of a contract are clear and unambiguous, there is no room for construction and the court must enforce those terms as written." <u>Watson v. City of E. Orange</u>, 175 N.J. 442, 447 (2003) (citations omitted); <u>see also</u> <u>Twp. of White v. Castle Ridge</u> <u>Dev. Corp.</u>, 419 N.J. Super. 68, 74-75 (App. Div. 2011). The court may not, however, make "a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." <u>Karl's Sales & Serv., Inc. v. Gimbel Bros.</u>, 249 N.J. Super. 487, 493 (App. Div. 1991) (citing <u>James v. Fed. Ins. Co.</u>, 5 N.J. 21, 24 (1950)).

When faced with differing proposed interpretations of contractual terms, we must determine whether the language of the agreement is indeed clear and unambiguous. <u>Schor v. FMS Fin.</u> <u>Corp.</u>, 357 N.J. Super. 185, 191 (App. Div. 2002).

> An ambiguity in a contract exists if the terms
> of the contract are susceptible to at least
> two reasonable alternative interpretations[.]
> To determine the meaning of the terms of an
> agreement by the objective manifestations of
> the parties' intent, the terms of the contract
> must be given their "plain and ordinary
> meaning."

> [Ibid. (alteration in original) (quoting
> Nester v. O'Donnell, 301 N.J. Super. 198, 210
> (App. Div. 1997)).]

"In construing [the] contract[, we] must not focus on an isolated phrase but should read the contract as a whole . . . ." Wheatly v. Sook Suh, 217 N.J. Super. 233, 239 (App. Div. 1987) (citing Joseph Hilton & Assocs., Inc. v. Evans, 201 N.J. Super. 156, 171 (App. Div. 1985)); see also Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009) ("A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." (citing DiProspero v. Penn, 183 N.J. 477, 496-97 (2005))). "A 'court should not torture the language of [a contract] to create ambiguity.'" Nester, 301 N.J. Super. at 210 (alteration in original) (quoting Stiefel v. Bayly, Martin & Fay, Inc., 242 N.J. Super. 643, 651 (1990)).

Here, the Lucianos argue that an ambiguity exists because contrary to Waste Management's contention, the word "event" used in the 1990 agreement's royalty provision was not an ongoing condition, but instead referred to the settlement of the dispute between MCTS, MCMUA and Morris County. Moreover, they contend section three established their perpetual right to royalties regardless of the owner or operator of the transfer stations. We disagree.

We conclude from our de novo review that Judge Minkowitz correctly determined that the Lucianos' and McCluskey's right to royalties terminated when Waste Management lost its contract to operate and receive income from the operation of the transfer stations. We therefore affirm substantially for the reasons expressed by Judge Minkowitz in his comprehensive April 22, 2016 and July 25, 2016 decisions. We add only the following comments.

The wording of the royalty clause is not ambiguous as it clearly expressed that a condition to the Lucianos' and McCluskey's receipt of royalties was Waste Management's ability to receive income for operating the transfer stations and participate in setting its rates through an agreement with the county.[5] Contrary to the Lucianos' contentions, the 1990 agreement expressly identified that one of its purposes was to "enable MCTS to reach a settlement or compromise of a rate or rates for such services provided by MCTS." There is no ambiguity in the language used by the parties that clearly expressed their understanding that in

---

[5] Our conclusion is consistent with the clear language of all of the agreements. For example, the 1987 stock purchase agreement specifically based royalties on "each ton of municipal solid waste accepted and processed by [MCTS,]" clearly inferring that their payment was conditioned upon MCTS operating the transfer stations and earning income from its endeavors. So too the ensuing royalty agreement dated November 10, 1987 that based the royalty upon "solid waste accepted and processed by [MCTS] at the . . . [t]ransfer [s]tation or [s]tations . . . which are constructed, developed and operated by [MCTS] . . . ."

order for the Lucianos and McCluskey to receive royalties, MCTS must operate the transfer stations and participate in the rates being charged through an agreement. Because the language of the contract is clear, we "must enforce those terms as written." Watson, 175 N.J. at 447 (citations omitted); see also Moscowitz v. Middlesex Borough Bldg. & Loan Ass'n, 18 N.J. Super. 182, 186 (1952) ("The parties are normally bound by the language employed regardless of some different intent or divergent understanding entertained by either party." (citation omitted)).

Section three of the 1990 agreement unambiguously created a condition precedent that had to be satisfied in order for the Lucianos and McCluskey to be entitled to royalty payments. In a condition precedent based on performance,

> [t]he parties may make contractual liability dependent upon the performance of a condition precedent . . . . Generally, no liability can arise on a promise subject to a condition precedent until the condition is met. . . . A condition in a promise limits the undertaking of the promisor to perform, either by confining the undertaking to the case where the condition happens, or to the case where it does not happen.
>
> [Duff v. Trenton Beverage Co., 4 N.J. 595, 604-05 (1950) (citations omitted).]

Although "condition precedents are 'disfavored by the courts.' . . . because the 'failure to comply with a condition precedent works a forfeiture[,]'" condition precedents are

enforceable when expressed clearly and unambiguously.  Liberty Mut. Ins. Co. v. President Container, Inc., 297 N.J. Super. 24, 34 (App. Div. 1997) (citations omitted).

Here, the first condition that the stations continue to exist was obviously satisfied.  The second condition, however, could not be satisfied after Waste Management lost the bid to operate the transfer stations,[6] and as a result it could no longer participate in setting the "rate per ton for waste handled at the transfer station . . . ."

The Lucianos' arguments that the word "event" used in section three of the 1990 agreement referred to the settlement of the dispute between MCTS, MCMUA and Morris County and that their right to royalties was perpetual as long as the transfer stations existed are without merit.  Nowhere in the parties' 1990 agreement is there any reference to any dispute between MCTS, MCMUA and Morris County.  The fact that a later amendment to the settlement agreement between MCTS, MCMUA and Morris County fixed rates for certain years did not give rise to a perpetual right to royalty payments.

---

[6]  Contrary to Waste Management's contentions, the sale of the transfer stations to the MCMUA, did not terminate its obligation to pay because it continued to participate in setting rates through entering into an agreement with the MCMUA.

21                                           A-0409-16T3

Moreover, if the parties had intended to create a perpetual contract covering the lifetime of the transfer stations, regardless of their owner or operator, as the Lucianos claim, there needed to be a "clear manifestation" that the parties intended such a perpetual right. In re Estate of Miller, 90 N.J. 210, 218 (1982). That is because generally, New Jersey law does not favor perpetual contracts. Ibid. "Absent an almost overwhelming showing that the parties to a contract intended such a one-sided, unreasonable construction, courts will not construe a contract as providing some perpetual right or option which one side can exercise against the other at any time in the future." Home Props. of N.Y., LP v. Ocino, Inc., 341 N.J. Super. 604, 613 (App. Div. 2001) (citing In re Estate of Miller, 90 N.J. at 218).

We turn to the Lucianos' contention that Judge Minkowitz should have allowed them to file the amended pleading alleging primarily that the 1991 amendment to the settlement agreement between MCTS, MCMUA and Morris County established that the 1990 agreement's precondition to the royalty payments was not intended to be ongoing. We find their argument to be without merit.

We review a trial court's determination on a motion to amend a pleading for a "clear abuse of discretion." Franklin Med. Assocs. v. Newark Pub. Schs., 362 N.J. Super. 494, 506 (App. Div. 2003) (quoting Salitan v. Magnus, 28 N.J. 20, 26 (1958)). Applying

this deferential standard, we conclude that Judge Minkowitz properly exercised his discretion and denied the Lucianos' motion because, as Judge Minkowitz found, the proposed amendment would still not have "state[d] a claim upon which relief [could] be granted . . . ." R. 4:6-2(e).

As Judge Minkowitz observed in his written statement of reasons, the 1991 amendment to the settlement agreement "only set rates agreed to by [MCTS] through 1994 . . . and do not provide for rates thereafter." He concluded "that nothing in any agreement or amendment indicates that the rate was set ad infinitum. To the contrary, [p]laintiffs' proposed amended [c]omplaint, based primarily on the 1991 [settlement amendment] and [the] 1993 [amendment to the Morris County Solid Waste Management Plan], evidence the intent that the rates were to be set until 1994."

While we acknowledge that motions for leave to amend should be liberally granted, "without consideration of the ultimate merits of the amendment," they need not be granted where, as here, granting the motion would be a "futile" and "useless endeavor." Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006) (citation omitted); see also Prime Accounting Dep't v. Twp. of Carney's Point, 212 N.J. 493, 511 (2013). We have no cause to disturb the judge's decision to deny the motion to amend.

We next address Waste Management's arguments that its counterclaim should not have been dismissed. According to Waste Management, although the court correctly found its "unjust enrichment claim [was] quasi-contractual and subject to a six-year [s]tatute of [l]imitations[,]" the statute of limitations "would not bar [its] claim to recover royalty payments mistakenly paid during the six-year period from October 30, 2009, to October 30, 2015, when Waste Management's [c]ounterclaim was filed." As a result, Waste Management contends it was error for the court to dismiss its "[c]ounterclaim in its entirety." Waste Management also contends that the application of the "volunteer rule" to its claim was erroneous. It argues the rule is inapplicable because it made the payments based on a mistake of fact.

We conclude that Waste Management's arguments are without merit. First, as we and Judge Minkowitz concluded, Waste Management was obligated to pay royalties as long as it operated the transfer stations and received payment for its services. Thus, the payments made by Waste Management through 2013 were not recoverable and there was no evidence that it made any payments after 2013.

Second, regardless of Waste Management's argument that its obligation to pay royalties terminated with the sale of the transfer stations, they are not entitled to recovery because they

24

are unable to prove a mistake of fact as a defense to the voluntary payment rule. See Villanueva v. Amica Mut. Ins. Co., 374 N.J. Super. 283, 287 (App. Div. 2005) ("[O]ne who has paid money under a mistake of fact but for which payment would not have been made may have restitution from the payee notwithstanding that the mistake was unilateral and a consequence of the payor's negligence, providing, however, that such restitution will not prejudice the defendant." (quoting Great Am. Ins. Co. v. Yellen, 58 N.J. Super. 240, 244 (App. Div. 1959))). The proofs here however are to the contrary as the Lucianos and McCluskey placed Waste Management on notice through their attorney's October 21, 1993 letter that the sale of the transfer stations did not relieve Waste Management of its obligations. With that notice, Waste Management continued to make payments for twenty years, until it ceased operating the transfer stations. Under these circumstances, there was no mistake of fact.

In light of our determination, we need not address any of the parties' remaining arguments.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0409-16T3